## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## BILLINGS DIVISION

| | |
|---|---|
| ARLENE HEIN and ESTATE OF WILLIAM HEIN, <br><br> Plaintiffs, <br><br> vs. <br><br> UNITED STATES OF AMERICA, DEPARTMENT OF THE INTERIOR, and all other persons, unknown, claiming or who might claim any right, title, estate or interest in or lien or encumbrance upon the real property described in the complaint adverse to Plaintiffs' ownership or any cloud upon Plaintiffs' title, whether the claim or possible claim is present or contingent, <br><br> Respondents. | CV 14-55-BLG-SPW-TJC <br><br><br> **FINDINGS AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE** |

Plaintiffs Arlene Hein and Estate of William Hein (collectively, the "Heins") seek to quiet title to certain real property contiguous to the Yellowstone River and Arrow Creek between Worden, Montana and Pompey's Pillar, Montana. (Doc. 49.)  Before the Court is Respondent United States of America's ("United States") Motion for Summary Judgment (the "Motion"), brought under Fed. R. Civ. P. 56(c).  (Doc. 56.)  For the reasons set forth below, the Court recommends that the United States' Motion be granted.

1

## I.     Factual Background

The Court compiled the background facts from the Heins' Second Amended

Complaint to Quiet Title (Doc. 49) (the "Complaint"), the parties' submissions

related to the instant Motion and to the United States' Motion to Dismiss (Doc.

36), and the cases cited.  The facts are undisputed unless otherwise noted.

### A.     Heins' Parcels

The Heins own parcels of real property which they describe as follows:

Lot 11, Section 21, T.3N., R.29E., PMM;
Lots 9 through 18, Section 22, T.3N., R.29E., PMM; and
Lots 3, 13, 14, and 15, Section 23, T.3N., R.29E., PMM.

(Doc. 49 at ¶ 3.)[1]

The Heins and their predecessors acquired the parcels through a series of

patents issued by the United States between 1918 and 1960.  The Heins' property

lies south of, and is bounded on the north by, the Yellowstone River.

The Heins claim that the original survey for their parcels conducted by the

U.S. Government in 1922 used "meander lines" "to mark the approximate edge of

---

[1] The Court previously noted both that none of the patents filed by the United
States in support of its Motion to Dismiss included Lot 16, Section 23, and that the
Heins did not discuss the ownership of Lot 16, Section 23, in their response to that
motion.  (Doc. 44 at 4, n. 4.)  The Heins apparently have abandoned their claim to
Lot 16, Section 23, alleging in their most recent Complaint that the United States is
the owner of that lot (*see* Doc. 49 at ¶ 4), although the United States denied
ownership of the lot at oral argument.  In any event, the Heins no longer assert a
claim to Lot 16, Section 23.

the farmable, upland lands along the margins of a water body" (in this case, the

Yellowstone River and Arrow Creek).  (*Id*. at ¶ 15.)  The Heins claim, however,

that the meander lines are not, and were not intended to be, the actual boundaries

of the surveyed parcels.  Instead, they maintain "[t]he true boundary of the

government lots is…the low or high water mark of the navigable water body (or

the middle of the lake or stream for non-navigable water bodies)."  (*Id*.)

The Heins further contend that, since the time their parcels were surveyed,

the boundaries of the parcels have changed "by the natural causes of the flow of

the Yellowstone River," resulting in "both accumulation and recession of the

river."  (*Id.* at ¶¶ 20, 30, 40, 50, 60, 70, 80.)  The Heins seek in this action to quiet

title to lands between their parcels' meander lines and the current high water mark

of the Yellowstone River (Counts 1, 3, 5, 7, 9, 11, and 13); between the

Yellowstone River's current high water mark and low water mark adjacent to their

parcels (Counts 2, 4, 6, 8, 10, 12, and 14); and between the meander lines on either

side of the body of water they refer to as "Arrow Creek (or a branch of the

Yellowstone River)" that lies south of the main channel of the Yellowstone (Count

15).  (*See generally* Doc. 49.)  The Heins initially named the United States and the

State of Montana as defendants in this quiet title action.  (Doc. 1).

**B.     United States' Interest in the Lands Bordering Heins' Parcels**

The Heins acknowledge that the subject lands are located within what was once the Crow Indian reservation, and were then held in trust by the United States for the Crow Tribe.  (Doc. 47 at ¶ 7.)   As this Court explained in *Crow Tribe of Indians v. United States*, 657 F. Supp. 573, 575 (D. Mont. 1985), *reversed on other grounds*, 819 F.3d 895 (9th Cir. 1987), "[t[he Crow Reservation was first set apart by the Treaty of Fort Laramie, 11 Stat. 749 (1851), and encompassed 38.5 million acres in what is now southern Montana and northern Wyoming."  The reservation was later reduced to roughly 8 million acres, located entirely within the state of Montana, by the second Treaty of Fort Laramie in 1868.  15 Stat. 649  ("1868 Treaty").  *Id.*  In the 1868 Treaty, "the United States agreed that the reservation 'shall be…set apart for the absolute and undisturbed use and occupation' of the Crow Tribe, and that no non-Indians except agents of the Government 'shall ever be permitted to pass over, settle upon, or reside in' the reservation."  *Montana v. U.S.*, 450 U.S. 544, 548 (1981).

The 1868 Treaty also established the boundaries of the Crow Indian Reservation as follows:

"[C]ommencing where the 107th degree of longitude west of Greenwich crosses the south boundary of Montana Territory; thence north along said 107th meridian *to the mid-channel of the Yellowstone River; thence up said mid-channel of the Yellowstone to the point where it crosses the said southern boundary of Montana*, being the 45th degree of north latitude; and thence east along said parallel of

4

latitude to the place of beginning...."  Second Treaty of Fort Laramie, May 7, 1868, Art. II, 15 Stat. 650.

*Id.* at 553, n. 4 (1981) (emphasis added).  Thus, the Crow Indian Reservation was bounded on the north and west by the mid-channel of the Yellowstone River.

After the establishment of the 1868 Treaty, "[s]everal subsequent Acts of Congress reduced the reservation to slightly fewer than 2.3 million acres. See 22 Stat. 42 (1882); § 31, 26 Stat. 1039–1040 (1891); ch. 1624, 33 Stat. 352 (1904) ("1904 Act"); ch. 890, 50 Stat. 884 (1937)."  *Montana,* 450 U.S at 548.

The 1904 Act is particularly relevant to the present case.  It provided for the cession of approximately 1,137,500 acres of the reservation to the United States, which created a "Ceded Strip" of land between the present reservation boundary on the south, and the Yellowstone River on the north.  *Crow Tribe of Indians*, 657 F.Supp. at 575.  The 1904 Act described the northern boundary of the Ceded Strip as running from the "western boundary of the Crow reservation; thence in a northeasterly direction, following the present boundary of said reservation [i.e., the mid-channel of the Yellowstone River] to the [northeast corner of the Reservation]."  33 Stat. 352, 353. The Heins' parcels are within Ceded Strip created by the 1904 Act.  (Doc. 49 at ¶ 6.)

The United States identified this same mid-channel northern boundary in a subsequent 1958 Congressional Act involving the Crow Tribe.  On May 19, 1958, Congress restored to tribal ownership "all lands now or hereafter classified as

5

vacant and undisposed-of ceded lands (including townsite lots) on" several

reservations, including the Crow Reservation.  Pub. L. No. 85-420, 72 Stat. 121

(1958).

Then, on August 14, 1958, Congress repurchased from the Crow Tribe

whatever interest the Tribe held in the surface estate of a tract of land described as

"the proposed exterior boundaries of the Huntley reclamation project, Montana."

Pub. L. No. 85-628, 72 Stat. 575 (1958).  The conveyance included the area of the

Yellowstone River contiguous to the Heins' parcels.  The Act describes the

included property as "[b]eginning at a point [in] the midchannel of the

Yellowstone River" which is east of the Heins' parcels, and ending at a point to the

west of Heins' parcels, "[t]hence downstream [east] along the midchannel of the

Yellowstone River to the point of beginning."  *Id*. at 575, 581.  Thus, Congress

again designated the mid-channel of the Yellowstone River as the northern

boundary for this acquisition.  These acts postdate all but one of the patents issued

to the Heins' predecessors in interest, the sole exception being Patent No. 1207955

describing in pertinent part Lot 12 of Section 22 (corresponding with Count 15

(Doc. 49 at ¶ 90-95)) and Lot 13 of Section 23 (corresponding with Counts 13 and

14 (*Id*. at ¶¶ 76-85)).

**C.     Montana's Interest in the Lands Bordering Heins' Parcels**

Ownership of the lands bordering and underneath the Yellowstone River at this location is further complicated by Montana's statehood.  When Montana joined the Union in 1889, it did so "on equal footing with the original States" under the Enabling Act of February 22, 1889, 25 Stat. 676, 679.  *Fidelity Exploration and Production Co. v. United States*, 506 F.3d 1182, 1184-85 (9th Cir. 2007).  Pursuant to the Enabling Act, Montana acquired title to the land that lay under navigable waters within its boundaries at the time of statehood.  *Id.*  This would include the Yellowstone River.

It has been established, however, that this title could be defeated by a "prestatehood conveyance of the land to a private party for a public purpose appropriate to the Territory[,]" *Utah Div. Of State Lands v. U.S.*, 482 U.S. 193, 197 (1987), or by a reservation of submerged lands to keep them "under federal control for an appropriate public purpose."  *U.S. v. Alaska*, 521 U.S. 1, 33-34 (1997). Therefore, a question exists as to whether the United States' conveyance of real property south of the mid-channel of the Yellowstone River to the Crow Tribe in the 1868 Treaty was such a "prestatehood conveyance" which defeated Montana's title to the land underneath the river.

The Heins plainly recognize this issue, and allege in their Complaint that "a controversy exists as to whether that portion of the Yellowstone River and its bed

located within the Ceded Strip was or was not transferred to [the] State of Montana at Statehood as it was then part of the Crow Indian Reservation.  Most, if not all, of the Lots at issue border this portion of the Yellowstone River."  (Doc. 49 at ¶ 10.)

The Heins also recognize the potential claims of both the United States and the State of Montana to the lands in question, and have filed this action to quiet title under the Quiet Title Act ("QTA"), 28 U.S.C. § 2409a.  The Heins name the United States as a defendant as "the former owner of the Lots in question as well as the owner of Lot 16, Section 23, T.3N., R29E., PMM."  (*Id.* at ¶ 4.)  The Heins also initially named the State of Montana as a defendant in this action, but the state was dismissed based on its Eleventh Amendment sovereign immunity.  (Doc. 23.)

## II.    Parties' Arguments

The United States advances several arguments in support of its Motion (*see generally* Doc. 57).  Because the Court finds that it does not have jurisdiction over this case in the first instance, however, it need only concern itself with the United States' argument that the Heins' failed to file this action within the QTA's twelve-year statute of limitations.  (*Id.* at 3-7.)

The United States first advanced its statute-of-limitations argument ("SOL Argument") in its Motion to Dismiss. (*See* Doc. 37 at 5-11; *see also* Doc. 44 at 6-7 for Court's summary of the United States' SOL Argument).  The Court determined at that time that it did not have sufficient information to dismiss the case on statute-

of-limitations grounds.  (Doc. 44 at 22-23.)  But the Court recommended – and

Judge Watters ordered (Doc. 45) – that the United States be permitted to renew its

motion upon further development of the record.  (*Id*. at 23.)

Accordingly, the United States reiterates its SOL Argument from its Motion

to Dismiss (Doc. 57 at 3-7), adding that the Heins have not come forth with any

evidence in the interceding period that would forestall summary judgment.

Specifically, the United States argues that "the lands south of the mid-channel of

the Yellowstone River were set aside for the Crow Indians pursuant to the [1868

Treaty]," and that "[t]his provided notice to Plaintiffs' predecessors that the United

States asserted a claim to the bed and banks of the Yellowstone that was

incompatible with the claim they currently advance, triggering accrual under the

QTA."  (*Id*. at 3.)  The United States further argues that this case is controlled by

*Fidelity Exploration & Production Co. v. U.S.*.  According to the United States,

*Fidelity* commands the conclusion that the "mid-channel" language in the 1868

Treaty sufficed to put the Heins on notice of the United States' claim to lands south

of the mid-channel of the Yellowstone River, and therefore their claim is time-

barred.  (Doc. 57 at 3-4.)

In response, the Heins argue that the United States has not presented any

additional information that would address the reasons the Court could not

previously dismiss the case on statute-of-limitations grounds.  (Doc. 69 at 3.)

9

Further, relying on *Montana v. U.S.*, the Heins argue that the land at issue could not have been owned by the United States because it was transferred to the State of Montana under the equal footing doctrine when Montana became a state. Accordingly, argue the Heins, their predecessors would have had no reason to know of any claim to the land on behalf of the United States.

## III.   Legal Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Material facts are those which may affect the outcome of the case.  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).  A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable fact-finder to return a verdict for the nonmoving party.  *Id.*

The moving party bears the initial responsibility of informing the court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Where the opposing party will have the burden of proof at trial, the moving party need only point to an absence of evidence to support the nonmoving party's case.  *Id.*

10

## IV.   Discussion

As discussed above, the United States argues that the Heins' QTA action is barred by the applicable statute of limitations, thus depriving this Court of subject matter jurisdiction.  (Doc. 57 at 3-7.)  The Court agrees.

The QTA "waives the federal government's sovereign immunity to certain civil actions by plaintiffs seeking to quiet title to property in which the United States claims an interest."  *Kingman Reef Atoll Investments, L.L.C. v. U.S.*, 541 F.3d 1189, 1195 (9th Cir. 2008).  The QTA provides, in relevant part:

> The United States may be named as a party defendant in a civil action under this section to adjudicate a disputed title to real property in which the United States claims an interest, other than a security interest or water rights.

28 U.S.C. § 2409a(a).  The QTA's limitations period is set forth in 28 U.S.C. § 2409a(g), as follows:

> Any civil action under this section, except for an action brought by a State, shall be barred unless it is commenced within twelve years of the date upon which it accrued.  Such action shall be deemed to have accrued on the date the plaintiff or his predecessor in interest knew or should have known of the claim of the United States.

"Knowledge or notice of such a claim is subject to a test of reasonableness."  *LNG Development, LLC v. U.S. Army Corps of Engineers*, 2015 WL 5155079, *6 (D. Ore., Aug. 31, 2015) (*citing McIntyre v. United States*, 789 F.2d 1408, 1411 (9th Cir. 1986); *Cal. ex rel. State Land Comm'n v. Yuba Goldfields, Inc.*, 752 F.2d 393, 396 (9th Cir. 1985) (finding that "the words 'should have known'…impart a test of

11

reasonableness" and that the government need not "communicate its claim in clear and unambiguous terms")).

"The court must strictly construe the [QTA]'s statute of limitations in favor of the government." *Shultz v. Dep't of Army*, 886 F.2d 1157, 1159 (9th Cir. 1989). Thus, "[k]nowledge of the claim's full contours is not required.  All that is necessary is a reasonable awareness that the Government claims some interest adverse to the plaintiff's." *LNG Development*, 2015 WL 5155079 at *10 (*quoting Kingman Reef*, 541 F.3d at 1198).  Further, the QTA's "statute of limitations applies retroactively," so it is not relevant whether the Heins' predecessors in interest were put on notice of any interest by the United States in the real property at issue before enactment of the QTA. *Kingman Reef*, 541 F.3d at 1197 (*quoting Donnelly v. United States*, 850 F.2d 1313, 1318 (9th Cir. 1988)).

"The Supreme Court has held that this limitations period is 'a central condition of the consent given by the [QTA].'"  *Fidelity*, 506 F.3d at 1185-1186 (*quoting U.S. v. Mottaz*, 476 U.S. 834, 843 (1986)).  "It is therefore subject to the rule that 'when Congress attaches conditions to legislation waiving the sovereign immunity of the United States, those conditions must be strictly observed, and exceptions thereto are not to be lightly implied.'"  *Id*. at 1186 (*quoting Block*, 461 U.S. at 287).  "[A]lthough a court 'should not construe such a time-bar provision

unduly restrictively,' it must 'be careful not to interpret it in a manner that would extend the waiver beyond that which Congress intended.'" *Id*.

Where, as here, a claimant seeks "fee title [to the property at issue as opposed to a non-possessory interest such as an easement], 'notice of a government claim that created even a cloud on the title may be sufficient to trigger the limitations period.'" *McFarland v. Norton*, 425 F.3d 724, 726 (9th Cir. 2005) (*quoting Michel v. U.S.* 65 F.3d 130, 132 (9th Cir. 1995) (citations omitted)). In fact, the claim need not be valid to trigger the QTA statute of limitations. "Simply put, the limitations period is triggered when a landowner has reason to know that the government claims some type of adverse interest in that land." *Spirit Lake Tribe v. North Dakota*, 262 F.3d 732, 738 (8th Cir. 2001). "The crucial issue," therefore, "is whether the plaintiff had notice of the federal claim, not whether the claim itself is valid." *Richmond Fredericksburg & Potomac R.R. Co. v. United States*, 945 F.2d 765, 769 (4th Cir. 1991).

The Heins filed their original complaint on April 29, 2014. (Doc. 1.) In order to fall within the QTA's twelve-year limitations period, then, their quiet title action against the United States would have had to accrue on or after April 29, 2002. Based on the foregoing authority, if the Heins' action accrued before April 29, 2002, the Court lacks subject matter jurisdiction over the action. *Fidelity*, 506 F.3d at 1186 ("we treat the statute of limitations in the QTA as jurisdictional.");

*see also Kingman Reef*, 541 F.3d at 1195-96 (*quoting Block*, 461 U.S. at 292) ("The running of the twelve-year limitations period deprives federal courts of 'jurisdiction to inquire into the merits' of an action brought under the QTA.").

The Court discussed the statute of limitations issue in the context of the United States' prior Motion to Dismiss (*see* Doc. 44 at 16-23), concluding that the record as then developed was insufficient to establish that the Heins or their predecessors in interest knew, or should have known, of an interest by the United States in the subject real property before April 29, 2002.  Specifically, the Court expressed concern that the record before it did not shed light on whether the cessions of territory by the Crow Tribe affected the parcels at issue; additionally, the record did not address "the timing of the cessions of land by the Crow Tribe," or "whether the United States otherwise conveyed them in a way that could have defeated Montana's title to the land at the time it achieved statehood."  (*Id.* at 22.)

Having reviewed the parties' additional submissions in the context of the instant Motion for Summary Judgement, as well as the pertinent treaties and Congressional actions germane to this tract of land, the Court concludes that the Heins or their predecessors in interest should have known of the United States' claim in the subject real property before April 29, 2002.  Accordingly, this Court is without subject matter jurisdiction.

As noted above, the 1868 Treaty established that all lands south of the mid-channel of the Yellowstone River fell within the Crow Reservation.  The Heins do not dispute that the 1868 Treaty encompassed the parcels at issue in this action, including the real property below the high water mark of the Yellowstone River and the banks of Arrow Creek.  Rather, the Heins argue that the State of Montana later took title to the bed of the Yellowstone River when it became a state in 1889, thereby divesting the United States and/or the Crow Tribe of any claim they may have had to the riverbed.  As a result of this transfer upon statehood under the equal footing doctrine, argue the Heins, they and their predecessors would have no reason to know of any claim on behalf of the United States because any such claim would have been extinguished in 1889.

In support of this argument, the Heins primarily rely upon *Montana v. U.S*. *Montana* involved consideration of the same 1868 Treaty between the United States and the Crow Tribe.  One of the issues before the Court was whether the treaty effectively conveyed to the Crow Tribe ownership of the bed and banks of Bighorn River, the pertinent stretch of which is located wholly within the reservation boundaries.  The Supreme Court held the language of the treaty was not sufficient to overcome the "established presumption that beds of navigable waters remain in trust for future States and pass to the new States when they assume sovereignty."  *Montana*, 450 U.S. at 553.  The Court, therefore, held "that

15

title to the bed of the Big Horn River passed to the State of Montana upon its admission into the Union….” *Id.* at 557. The Heins reason that the same analysis applies to the ownership of the bed of the Yellowstone River.

The Court disagrees with the Heins' argument in general, and the controlling effect of *Montana* in particular. Unlike in *Montana*, the pertinent issue in this case is not whether the United States has a valid claim to the subject property. The Heins are correct that the validity of the United States' claim would depend upon an analysis under *Montana* and its progeny to determine whether ownership of the bed of the southern half of the Yellowstone River was effectively conveyed to the Crow Tribe in the 1868 Treaty, or whether it passed to the State of Montana in 1889. But the critical issue for the instant summary judgment Motion is not the validity of the claim; rather, it is whether the Heins had reason to know that the United States claimed some type of adverse interest in the land. On this issue, the Heins' argument cannot be squared with the Ninth Circuit's holding in *Fidelity*.

In *Fidelity*, plaintiff Fidelity Exploration and Production Co. (“Fidelity”) “[sought] to quiet title to a portion of the bed of the Tongue River on which it [held] oil and gas leases issued by the State of Montana, but to which the United States lay[] claim as trustee for the Northern Cheyenne Indian Tribe.” *Fidelity*, 506 F.3d at 1184. The original boundary of the Northern Cheyenne Reservation lay roughly ten miles from the Tongue River. *Id.* In 1886, in the wake of growing

16

conflict between the Northern Cheyenne Tribe and non-tribal settlers, the Secretary of the Interior reserved certain lands up to and including the banks of the Tongue River in order to determine a sufficient boundary for the reservation; those were the conditions at the time Montana became a state in 1889. *Id*. (citing House Ex. Doc. No. 1, Pt. 5 at 229, 50th Cong., 1st Sess. (1887), Vol. 2).

Following a series of studies and proposals over the course of the next several years, the reservation's boundary was fixed "in the middle of the channel of the Tongue River" by executive order dated March 19, 1900. *Id*. at 1185. That executive order was confirmed by Congress in the Northern Cheyenne Allotment Act of 1926, which stated in pertinent part:

> That the Northern Cheyenne Indian Reservation heretofore set apart by Executive order dated the 19th day of March, 1900, for the permanent use and occupation of the Northern Cheyenne Indians, in Montana, be, and the same is hereby, declared to be the property of said Indians, subject to such control and management of said property as the Congress of the United States may direct.

44 Stat. 690, § 1.

Fidelity's QTA action involved a five-mile stretch of the Tongue River riverbed where Fidelity's lease overlapped with the reservation boundary. *Id*. The United States moved to dismiss the case, based in part on its argument that Fidelity had failed to adhere to the QTA's twelve-year statute of limitations. *Id*. In its Findings and Recommendation of United States Magistrate Judge, this Court found

in favor of the United States and recommended dismissal of the case, explaining in

pertinent part:

> In the Executive Order of 1900, the eastern boundary of the Reservation
> was described as the middle channel of the Tongue River.  This
> boundary was adopted in the Northern Cheyenne Allotment Act of June
> 3, 1926.  This Act of Congress constituted notice to the world that the
> United States claimed an interest in the Tongue River on behalf of the
> Tribe.  No claim could be more open than one embodied in an Act of
> Congress.

Findings and Recommendation of United States Magistrate Judge, CV 04-100-

BLG-RWA (D. Mont. Oct. 17, 2005) (citing *Government of Guam v. U.S.*, 744

F.2d 699, 701 (9th Cir. 1984)).

The Ninth Circuit Court of Appeals affirmed the district court's ruling that

the case was time-barred, explaining that Fidelity's predecessor in interest (the

State of Montana) "knew or should have known of the United States' claim to the

western Tongue River bed at least as of 1926 when the Northern Cheyenne

Allotment Act of 1926 was enacted."  *Fidelity*, 506 F.3d at 1186.

The Court finds the holding in *Fidelity* to be controlling here.  Both *Fidelity*

and the instant case deal with a river that formed the boundary of a reservation

(rather than a river within a reservation), and in both cases that boundary was set at

the "mid-channel" of the river.  Because the "mid-channel" of the river extends

farther than either the high or low water marks, a riparian owner, such as the Heins

in this case, should be on notice that the reservation boundary may extend into the

riverbed, and that the owner of the real property constituting the reservation – be it the Tribe or the United States, following cession of the land – has some claim to that riverbed.

The Heins attempt to distinguish *Fidelity* in two ways: (1) they contend the act of Congress at issue in *Fidelity* contains stronger property-conveyance language than does the 1868 Treaty, and (2) they assert the Crow Tribe's relationship with the Yellowstone River did not constitute a "public exigency" that would support preservation of the riverbed at the expense of the State of Montana. (Doc. 60 at 5-6.)

As to the first argument, the Court disagrees both that the conveyance language was stronger in *Fidelity*, and, more importantly, that the language in the 1868 Treaty was insufficient to convey the property to the Crow Tribe. In fact, in considering the effect of the 1868 Treaty, the United States Supreme Court found that the United States "did expressly convey land to the Crow Tribe." *Montana*, 450 U.S. at 553.

With respect to the Heins' second argument, the "public exigency" issue may be a relevant consideration if the Court were ultimately required to determine the validity of the United States' claim. As discussed in *Montana*, consideration of a tribe's use of a waterway at the time of conveyance may be relevant to the determination of whether a "public exigency" existed, requiring "Congress to

19

depart from its policy of reserving ownership of beds under navigable waters for the future states." *Montana*, 450 U.S. at 555.  Again, however, the issue here is not the validity of the United States' claim, but whether Heins had notice of the claim sufficient to trigger the QTA statute of limitations.  When considering the latter issue in *Fidelity*, the Ninth Circuit did not even mention the Northern Cheyenne tribe's historic use of the Tongue River as a factor to be considered, or whether any sort of "public exigency" existed.

In short, it is possible that the Heins are correct that any claim created by such "mid-channel" language would have been extinguished under the equal footing doctrine when Montana became a state.  (*See*, e.g., Doc. 60 at 4-7.)  But the Court need not reach that issue.  As explained above, the United States' claim need not be lawful or even facially valid in order for the statute of limitations to begin to run; rather, "notice of a government claim that created even a cloud on the title may be sufficient to trigger the limitations period."  *McFarland*, 425 F.3d at 726.

Under *Fidelity*, the 1868 Treaty was sufficient on its own to constitute such a cloud, given that it established the boundary of the Crow Reservation at the mid-channel of the Yellowstone, and no subsequent conveyance reduced the Reservation boundary to the high or low water mark.  Furthermore, even assuming *arguendo* Montana's foundation as a state constituted an implicit transfer of ownership of the riverbed in 1889, the 1904 Act explicitly ceded to the United

20

States everything up to "the present boundary of [the Crow Reservation]," which boundary remained fixed at the mid-channel of the River, even if the Crow Tribe did not own the riverbed beneath the boundary.  Assuming further that the language from the 1904 Act was not explicit enough to put the Heins' predecessors on notice of the United States' claim, the Heins' predecessors certainly knew or should have known of the United States' claim to the Yellowstone riverbed no later than 1958 when an act of Congress sought to repurchase from the Crow Tribe all undisposed-of lands within the Huntley Reclamation Project, beginning and ending at the mid-channel of the Yellowstone, once again explicitly referring to the River's "midchannel."  72 Stat. at 575, 581.  As Judge Anderson explained in *Fidelity*, "[n]o claim could be more open than one embodied in an Act of Congress."

Finally, the act of joining the United States in this lawsuit demonstrates that the Heins were on notice of the United States' potential claim.  During oral argument, held June 21, 2017, the Court asked the Heins' counsel what happened between April 29, 2002, and April 29, 2014[2], that put the Heins on notice that the United States may have a claim to some or all of the real property at issue.  The Heins' counsel explained that nothing occurred in that time period to put the Heins

---

[2] The twelve-year period prior to the date the Heins filed this lawsuit, within which their QTA claim must have accrued.

on notice of the United States' claim; rather, the Heins initiated this QTA action in response to increased recreational use of the Yellowstone River in the area. This increased use does not implicate the United States or its claim in any way. Therefore, if the Heins had cause to believe, as of April 29, 2014, that the United States may have some claim to the subject real property, that cause was equally present on April 28, 2002.

For these reasons, the Court finds that the statute of limitations on the Heins' QTA claim against the United States expired no later (and likely much earlier) than August 14, 1970, that being twelve years following the passage of the Congressional act of August 14, 1958.

## V.    Conclusion

Based on the foregoing, IT IS RECOMMENDED that the United States' Motion for Summary Judgment (Doc. 56) be GRANTED to the extent it argues that the statute of limitations has expired.

NOW, THEREFORE, IT IS ORDERED that the Clerk shall serve a copy of the Findings and Recommendations of United States Magistrate Judge upon the parties. The parties are advised that pursuant to 28 U.S.C. § 636, any objections to the findings and recommendations must be filed with the Clerk of Court and copies served on opposing counsel within fourteen (14) days after entry hereof, or objection is waived.

DATED this 14th day of July, 2017.


_____
TIMOTHY J. CAVAN
United States Magistrate Judge